*EX PARTE* WILLIAMS.

GIBBES v. GREENVILLE AND COLUMBIA R. R. COMPANY.

STATE, *EX RELATIONE* ATTORNEY-GENERAL v. SAME.

A purchaser, on new and ample consideration, of bonds constituting a part of the assets of a railroad company in the hands of a receiver, without knowledge or notice of the trust, is not liable to the creditors of the corporation for the value of the bonds.

Before FRASER, J., Richland, December, 1881.

George W. Williams, as treasurer of a syndicate formed to assist the South Carolina Railroad Company, received from that company as collateral security for advances made and to be made, certain securities, including two notes given by the Greenville and Columbia Railroad Company to the South Carolina Railroad Company, secured by a deposit of mortgage bonds of the former company, which bonds passed to Williams, treasurer, with the notes they were intended to secure. One of these notes was for $51,432, secured by 103 Greenville and Columbia Railroad second mortgage bonds, of $500 each, dated December 30th, 1876; and the other of the same date, was for $135,818.74, secured by 543 like bonds.

All of these bonds were, after the maturity of the notes, sold by the syndicate, and G. W. Williams, as their treasurer, presented two petitions in this cause, asking in each for the payment of the balance due on the notes, respectively, out of the receiver's fund, inasmuch as the notes were given for the necessary expenses of the road while in the hands of the receivers appointed by Judge Melton's order of June 18th, 1872. The petition as to the note for $51,432, was disposed of by the opinion of this court refusing it to be found reported as *Ex parte Williams*, 17 *S. C.* 396.

This case is the petition as to the note for $135,818.74, which

was also refused by the Circuit decree in this cause, and from such refusal no appeal was taken. But in answer to this petition, Clyde *et al.*, holders of second mortgage bonds (and who as such would receive all the funds in the cause not absorbed by claims of higher rank) interposed as a counter-claim that the pledge of the bonds to the two notes above described was illegal, and that G. W. Williams, treasurer, should be decreed to account for the said collaterals or their value.

Judge Fraser also dismissed the counter-claim. So much of his decree as relates to this counter-claim was as follows:

The only question then left for my consideration is that of the counter-claim set up by W. P. Clyde and others, that the petitioner, George W. Williams, treasurer, should be held to account for the 543 and 103 second mortgage bonds above referred to, on the ground, as I understand it, that they were assets in the hands of the receivers, who sold them without authority, and that of this the petitioner was bound to take notice, so that in his hands the bonds were effected with the trusts under which the receivers held them. The counter-claim is filed by William P. Clyde, Thomas M. Logan and Joseph Bryan, on behalf of themselves and other holders of second mortgage bonds, who claim to be entitled to the net proceeds of the sale and income in the hands of the master. These are the same parties who bought these bonds from the petitioner.

The first provision of Judge Melton's order was one which enjoined all creditors from commencing or prosecuting any suits against the corporation, or enforcing judgments already obtained by execution against the property. The second provision was one which put the property in the hands of the president and directors, and substituted the "order" and direction "of the court" for the will of the stockholders. The corporation, whose will is expressed only by the stockholders, were displaced by the order, and President Magrath, in his annual report for the fiscal year ending December 31st, 1872, says: "Under the operation of the orders growing out of these proceedings no suits could be instituted, and no payments made, except for the absolutely necessary wants of the road." If this clear and correct view of their powers and duties had not been lost sight of by the

president and directors, many of the embarrassing questions which have arisen in this administration would have been avoided.

If any other orders of the court were necessary before they assumed any conduct of the business, then not one train could have moved from the depot, as no order was made except the one referred to, " to continue to conduct and carry on the business of the said company." The true conception of the scope of this order, in my view, is that every act of the president and directors was subject to the supervision and control of the court, and that to them, as to all receivers, necessary expenditures for labor and material would, as a matter of course, be allowed; but when they went beyond this to make permanent improvements and changes, speculative contracts for rebates, and the purchase and sale of bonds, they, and all who dealt with them, should have understood that their contracts might not meet the approval of the court. I find neither in the order itself or in any decision or *dictum* of the court any warrant for that unlimited power claimed in some quarters, and expressed by the words " in like manner as they have heretofore done."

We must, therefore, look to other considerations to determine whether this is a valid counter-claim. The objection to the mode in which this counter-claim is presented has been waived at the hearing, and we must look to its merits. The peculiar order of Judge Melton was perhaps the best which could have been made for the interest of all parties in the abnormal condition of the country at the time it was made. Perhaps it was never intended to interfere with the corporate existence of the railroad company, and there is nothing in the order which does (see *High on Receivers*, § 397, *note* 2); and it does not follow that third parties who dealt with the president and directors in a manner lawful with them as officers, and unlawful as receivers, necessarily knew that they dealt in the latter capacity.

To make the petitioner liable to this counter-claim, there must have been something in this transaction which affected him with notice that he was dealing with trust funds. If any third person, entirely unconnected with the company or its business, had been appointed receiver, the mere fact of dealing in this way

might have been sufficient, at least, to put a prudent man on his guard. It does not strike me that the same conclusion would follow here. There is nothing on these bonds which show that they were a part of the assets in the hands of the receivers, either as a part of the *corpus* or as being an investment temporarily made of the income, and there is no evidence to show that they were not purchased with money, which the evidence shows was from time to time borrowed by the president and directors.

If the old doctrine of *lis pendens* is any longer applicable, except as to the specific cases prescribed in the code, it will be found that it was only applicable to specific property, which " must be so pointed out by the proceeding as to warn the whole world that they meddle at their peril." See *Lewis* v. *Mew*, 1 *Strobh. Eq.* 183 ; *Edmonds* v. *Crenshaw*, 1 *McC. Ch.* 261. Cash and negotiable paper not due are not affected in the absence of actual notice. *Wade Law of Notice*, §§ 371, 372. I do not see why corporation bonds can be subject to a different rule. " There must be something in the pleadings or in the published notice at the time of the purchase to direct the purchaser's attention to the identical thing, which is the subject of the litigation, the notice being purely constructive of the facts contained in the bill and nothing more." *Wade on Notice*, § 351.

The purchase of these bonds by the South Carolina Railroad Company to secure an antecedent debt may not have had a sufficient consideration to support it, but the purchase by George W. Williams, as treasurer of the syndicate, from the South Carolina Railroad Company, was upon a new and ample consideration, the loan of money or credit, which was sufficient even if the original purchase from the receivers had been tainted with a want of proper consideration.

There is, however, another feature of this case which makes it a very peculiar one. In order to entitle litigants to the protection afforded by the constructive notice of the *lis pendens,* there must be diligence in the prosecution of the suit. I have found no case where the parties lost that protection unless there was laches in reviving a suit which had abated. 2 *Lead. Cas. Eq.* 125, 126, 127 ; but I see no good reason why it should not be lost by other conduct of the parties. In this case the order

of Judge Melton was made in 1872, on June 17th, and for over six years, until 1878, November 23d, not one single report was made or called for from the custodians of the property appointed by the court. In the meantime, while enjoying the protection of the court from suits and executions, the lien creditors, including the holders of these second mortgage bonds, received their interest from the surplus income and from borrowed money from July, 1873, to July, 1877. Thus every holder of these bonds was a party to this infringement of the order of the court, and all who purchased these bonds, or any of them, are subject to such equities as existed against these bonds in consequence of these transactions.

I think those who then held these bonds would be estopped from claiming, in the face of these proceedings (for they were all called in as parties to the suit), the protection of the *lis pendens* as amongst themselves, or in transactions with others who dealt in these bonds, on the faith that they were on the market, free from all entanglements, which might impose on them the character of trust funds, because they may have been at one time in the hands of those who, though officers of the company, were also receivers appointed by the court. I do not see how these receivers had any right to make a payment of interest on second mortgage bonds, to which the blue bonds and the guaranteed bonds were prior, or even the interest on these latter bonds themselves, under the order of Judge Melton.

As to all creditors there was an exhaustive order to prove their claims before the referee, and President Magrath was right when he said to the stockholders that there could be "no payments made" under this order; and when subsequently these lien creditors did accept for four years successively payment of their interest coupons, they opened the way to unsecured creditors to accept, I think with safety, any money or security they could obtain. Clyde and others, who now hold these bonds, I think ought to be bound as privies. 2 *Lead. Cas. Eq. p.* 653. I find no evidence to contradict the sworn statement of George W. Williams that he never qualified or acted as a director of the Greenville and Columbia Railroad Company, and if he was ever an acting director, I do not see how he can be made to answer to

parties or their privies for acting without the authority of the court, who, to say the least, were equally at fault. The rights of parties who were not admitted to this premature division of assets, stand on a different footing, and some of them have been recognized by the court. The counter-claim cannot therefore be allowed.

It is therefore ordered and adjudged that the petition be dismissed, each party paying his own costs.

Clyde *et al.* appealed from so much of this decree as dismissed their counter-claim.

*Mr. James Conner* for appellants.

*Messrs.* Buist & Buist, Lord & Inglesby, Simonton & Barker, contra.

November 27th, 1882. The opinion of the court was delivered by.

Mr. Chief Justice Simpson. In this case the only question involved is the question of the counter-claim set up in the answer of the defendants. This claim was dismissed by the Circuit judge.

The question involved in the appeal is the same as that raised and decided in the recent case of *Ex parte The Carolina National Bank, In re The Attorney-General et al. v. The Greenville and Columbia Railroad Co., ante* 289. It is true that, in this case, the objection to the mode in which the counter-claim was presented was waived at the hearing, and the case was heard upon its merits.

The decree of the Circuit judge is based upon the fact that there was not sufficient evidence before him that the petitioner had notice that he was dealing with trust funds when he became possessed of the funds in question. We think this was the turning-point in the case, and we find nothing in the testimony which would authorize this court to overrule the Circuit judge in his conclusions upon this subject. The petitioner never qualified or acted as a director of the Greenville and Columbia Railroad. He purchased these bonds as treasurer of the syndi-

cate from the South Carolina Railroad Company upon a new and ample consideration. There was nothing in the bonds themselves which advertised parties that they constituted part of the assets in the hands of the receiver. And finally, there was no sufficient testimony to bring the case under the operation of the equity doctrine which holds parties responsible for trust funds or property obtained from a trustee with a knowledge of the trust. The counter-claim can have no standing even as a cause of action except upon this doctrine, and the important fact of knowledge by the petitioner of the trust character of the bonds being absent, there is nothing through which this doctrine can be applied and enforced.

It is, therefore, the judgment of this court that the judgment of the Circuit Court be affirmed.